UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCI WILLIAMS, | Case No. 18-cv-00881-JCS |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| UNITED AIRLINES, INC., | Re: Dkt. No. 67 |
| Defendant. | |

## I.      INTRODUCTION

Plaintiff Nanci Williams brought this action against her former employer Defendant United Airlines, Inc. ("United") asserting claims including wrongful termination based on age and disability.  United moves for the summary judgment.  The Court held a hearing on June 21, 2019. For the reasons discussed below, United's motion is GRANTED.[1]

## II.      BACKGROUND

### A.      Factual Background

Williams, who is currently fifty-two years old, began working as a flight attendant for United in 1990.  Williams Decl. (dkt. 73-1) ¶¶ 3, 5.  At all times relevant to this case she was in the highest salary tier for United flight attendants based on her seniority.  *Id.* ¶ 16.

Williams suffered an injury when an airplane she was working on rapidly and unexpectedly descended in 2003, slamming Williams against both the ceiling and the floor of the airplane and resulting in diagnoses of a concussion, cervical spine sprain, chronic myofascial pain syndrome, fibromyalgia, and an auto-immune disease.  *Id.* ¶ 6.  Williams has experienced a wide range of symptoms in the years since the injury, and a worker's compensation decision attributed all of her symptoms to that incident.  *Id.*  Williams attempted to return to work, but took medical

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

leave due to severe pain from 2003 to January of 2007.  *Id.* ¶ 7.  "When [Williams] returned to work in late 2008 or early 2009,"[2] United offered employees a voluntary furlough, and Williams accepted a furlough through March of 2013.  *Id.* ¶ 8.  Williams worked until September of 2013, but returned to medical leave at that time, which was classified as a "nonoccupational medical leave of absence" under United's policies.  *Id.* ¶ 10; Khoury Decl. (dkt. 67-1) Ex. E (Williams Dep.) at 300:6–9.

Williams's treating physician Dr. Teitelbaum provided United with "Absence Certificates" that United required Williams to submit monthly even though Dr. Teitelbaum informed United that Williams's condition was permanent and did not require such frequent reevaluation.  Williams Decl. ¶¶ 9, 11–14.  Williams found United's conduct while she was on leave to be difficult and harassing, including United's repeated requests for Absence Certificates, failure to provide its policy on medical leave to Dr. Teitelbaum, unresponsiveness to Williams's calls and faxes, and apparent failure to keep notes regarding Williams's leave and medical condition.  *Id.* ¶¶ 12–15.  Williams testified, however, that United never failed to provide assistance that she requested and granted each of her requests for medical leave.  Khoury Decl. Ex. E (Williams Dep.) at 164:14–25, 192:5–7.  Williams also testified that she never attempted to engage in an interactive process with United regarding accommodation of any disability, because her union had told her that United's program for such a process is not effective, and Williams therefore did not trust United to engage with her.  *Id.* at 305:4–307:5.

In December of 2015, Williams's work restrictions based on her medical condition included prohibitions against standing for extended periods of time, assisting passengers with physical tasks, managing crew and passengers, and resolving conflicts between passengers, among other limitations.  Williams Decl. ¶ 17.  The restriction perhaps most relevant to this case is as follows: "No exposure to varying climate conditions and air pressures."  *Id.*; *see also* Haralabopoulos Decl. (dkt. 68) Ex. 8 (United document summarizing Williams's medical restrictions).

---

[2] It is not clear whether Williams was working or what if any sort of leave she was on from January of 2007 until this date approximately two years later.

That month, Williams, her husband, and her parents boarded a United flight from San Francisco to Cancun, Mexico, using Williams's privilege as an employee to fly for free or a significant discount so long as space was available on the flight. *See* Williams Decl. ¶ 23; Khoury Decl. Ex. E (Williams Dep.) at 155:21–156:3. Under United's rules for such travel, Williams was responsible for the behavior of her family members, and Williams understood that at the time of the incident. Khoury Decl. Ex. E (Williams Dep.) at 156:4–7, 245:12–22, 286:24–287:9. Williams also understood that her employment could (but not necessarily would) be terminated for a violation of the discounted travel rules. *Id.* at 264:4–8.

As the airplane started to taxi from the gate, Williams and her husband began to argue about a cup of coffee, and the dispute became physical. *Id.* at 151:5–18, 152:1–16. According to Williams, her husband began to choke her, and Williams scratched his face in self-defense, drawing blood.[3] *Id.* at 151:19–22; Williams Decl. ¶ 23. Williams, her husband, and her father all left their seats despite the "Fasten Seat Belt" sign being lit at the time. *See* Khoury Decl. Ex. E (Williams Dep.) at 151:23–25, 152:20–25, 154:23–25. Williams's husband and father went to the first class area near the flight deck in the front of the plane, Williams's husband asked to be let off the plane, and a flight attendant reported that Williams's father called her husband a "pussy." *See id.* at 155:1–12, 245:9–11, 261:19–262:4. The plane returned to the gate as a result of the altercation. *Id.* at 154:12–13, 169:9–19.

Authorities met the plane at the gate, and Williams was escorted off the plane and taken into custody by San Francisco police at an airport substation, where she was told she would be charged with felony domestic violence. *Id.* at 178:17–19, 179:2–7, 182:2–11, 262:5–12. Photographs taken by the police showed scratches on Williams's husband's face. *Id.* at 310:16–

---

[3] In the context of United's motion for summary judgment, the Court takes as true Williams's testimony that her husband, rather than Williams herself, was the aggressor in their fight on the airplane. The Court's task here is narrow: to determine whether Williams has presented evidence from which a finder of fact could find that United discriminated or retaliated against her based on the theories asserted in her complaint. Although the Court holds that Williams has not made the necessary showing to prevail on any of those theories, this order should not be taken as excusing domestic violence or minimizing the trauma that Williams undoubtedly experienced as a result of this incident, or as endorsing the decision to fire an employee on account of an incident involving domestic violence without regard for whether the employee was a victim.

20.  Williams agreed at her deposition that her family members violated United's rules for conduct when traveling on an employee's pass.  *Id.* at 264:10–13.  The incident caused a delay of approximately twenty-six minutes for the other passengers on the flight.  *Id.* at 170:25–171:9.

The day of the incident, Lisa Lujan (a representative of United's "Corporate Security – Compliance" department) sent an email to several other United employees advising them that Williams was taken into custody on a felony charge by police as a result of the fight. Haralabopoulos Decl. Ex. 4.  Carol Bertacchi, a manager of United's "Inflight Services" department, responded to that email the next day, noting that Lujan had inquired as to Williams's status.  *Id.*  Bertacchi reported that Williams

> has been out on a leave of absence but will need to meet with her supervisor to discuss several issues without regard to what happens with her criminal case:
>
> - her conduct and arrest on the flight
>
> - regardless of the fact that it is her husband she violated her actions on the aircraft falls into violence in the workplace
>
> - her conduct also violates our pass policies for conduct while traveling, and resulted in the plane having to return to the gate

*Id.*

On December 8, 2015, Williams met with her supervisor Lee Ann Butler-Owens and other United employees to discuss the incident.  Gutierrez Decl. (dkt. 73-2) Ex. D (meeting notes taken by another employee).  Butler-Owens told Williams that United was more concerned about the flight delay that the incident caused than about Williams's arrest, that Williams needed to write a report, and that the incident could lead to termination of her employment.  *Id.*  Williams met again with the same group of employees on December 10, 2015.  Gutierrez Decl. Ex. E (meeting notes taken by another employee).  Most of that discussion focused on the circumstances of the disturbance on the plane, although Butler-Owens also informed Williams that, despite the generally applicable policy that employees did not have to ask permission to travel, she would need to submit something from her doctor to show that she was able to fly, and Butler-Owens also briefly asked Williams if she was traveling for vacation.  *Id.*

Williams sent a letter to United dated December 26, 2015 "apologiz[ing] for causing a

disturbance with [her] husband that led to the plane returning to the gate and having the crew and passengers delayed from taking off," and "for getting out of [her] seat while the seatbelt sign was on." Haralabopoulos Decl. Ex. 6. Williams's husband submitted a similar letter apologizing for the disturbance, for leaving his seat and walking towards the cockpit while the plane was moving, for asking to leave the plane, and for causing the delay. Haralabopoulos Decl. Ex. 7.

Williams focuses on evidence that, in the aftermath of the December 2015 incident, various United employees (including but not limited to Butler-Owens, labor strategy specialist Elizabeth Cavanagh, and Employee Service Center Operations manager Carlos Rivera) investigated whether Williams was in fact subject to the medical restrictions that she had claimed, beginning with suspicion that she would not have been able to fly as a passenger with such restrictions, and including a review of social media posts that United employees apparently believed suggested that Williams was healthier than she had indicated. *See, e.g.*, Gutierrez Decl. Exs. I, J, O, P. A registered nurse employed by United sent Rivera an email on December 8, 2015 stating that, based on Williams's medical restrictions, he "would assume [she] is severely disabled and not appropriate to fly SA [apparently meaning 'space available'] anywhere." Gutierrez Decl. Ex. J. Rivera sent an email to multiple United nurses on January 28, 2016 asking them to create a document indicating that air travel would not be recommended for Williams and would exacerbate her condition, but a different nurse responded that she was "unable to write that [Williams's] condition(s) would be exacerbated by her pass travel" because it "would be considered diagnosing the employee and out of scope of practice as an RN." Gutierrez Decl. Ex. I.[4]

Butler-Owens sent Williams a "Performance Letter of Charge" on January 19, 2016. Haralabopoulos Decl. Ex. 5. The letter included a relatively long paragraph describing the altercation on the flight, and asserted more briefly that Williams was "also in violation of the

---

[4] Williams's opposition brief characterizes these documents as showing that Rivera sought and obtained the opinion that Williams was unable to travel after being told that United's nurses were not qualified to provide such an opinion. Opp'n at 13 ("This was not enough to dissuade Defendant and eventually another medical specialist created the requested document. (Exhibit I)."). The document attached to the emails included as Exhibit I merely lists Williams's restrictions; it does not include the opinion that the nurse stated would be improper, i.e., whether travel would exacerbate Williams's conditions. *See* Gutierrez Decl. Ex. I.

1  Working Together Guidelines with respect to Honesty in that this occurred while you were on a

2  medical leave of absence, purporting to be too ill to work as a flight attendant." *Id.* The letter

3  informed Williams that a conference would occur on February 1, 2016[5] to determine what if any

4  action would be taken. *Id.* Williams asserts in her declaration that this letter stated that her

5  employment was terminated, but no such statement appears in the letter, and the sentence she

6  quotes in her declaration in fact appears in an April 2016 letter from Peter Haralabopoulos, the

7  director of the Inflight Services department (i.e., United's flight attendants) in San Francisco and

8  the hearing officer responsible for determining what discipline should be imposed. *See* Williams

9  Decl. ¶ 26; Gutierrez Decl. Exs. F, G.

10       Rivera sent Cavanagh and other United employees an email on January 27, 2016 with the

11  subject line "SFOSW Nancy [sic] Williams u140114 - Possible Fraud," stating that Rivera was not

12  sure if they were aware of Williams's travel to Cancun while on leave, listing her restrictions, and

13  concluding that "there is NO WAY she would be able to travel anywhere" and that her restrictions

14  might be fraudulent. Gutierrez Decl. Ex. O. Cavanagh responded three minutes later that she

15  "brought it up and we are terminating her." *Id.*

16       On April 4, 2016, Williams attended a conference with Peter Haralabopoulos, Butler-

17  Owens, and union representative Chris Black. Khoury Decl. Ex. E (Williams Dep.) at 247:12–23.

18  Haralabopoulos served as the hearing officer, and because he expected that he would serve in that

19  role for any discipline that might be imposed, he states that he had not played any part in the

20  investigation leading up to the hearing. Haralabopoulos Decl. ¶ 14. The union had an opportunity

21  to present information on Williams's behalf, but the two letters it offered (from Dr. Teitelbaum

22  and Williams's husband) were not submitted until the date of the hearing, and Haralabopoulos

23  rejected them as untimely. *See* Khoury Decl. Ex. E (Williams Dep.) at 248:13–23, 251:11–16.

24  Williams also had an opportunity to speak on her own behalf, and made a "short statement,"

25  although she was not limited in how long she could speak. *Id.* at 251:17–23.

26       Haralabopoulos states in his declaration that, after the hearing, he determined that

27

28  ---
[5] It appears that the date of the conference was later changed to April 4, 2016; there is no indication in the record that a conference in fact occurred on February 1, 2016.

Williams's employment should be terminated "based on the egregious conduct of both Ms. Williams and her family members while on board the aircraft on December 3, 2015, the resulting delay and inconvenience caused to United's customers, and the admissions of both Ms. Williams and her husband as set forth in the [December 2015] letters of apology."  Haralabopoulos Decl. ¶ 29.  According to Haralabopoulos, those letters were relevant "because they admitted critical facts about the incident and offered no mitigating circumstances," and it was not relevant whether Williams or her husband started the fight.  *Id.* ¶¶ 21, 29.  Haralabopoulos sent Williams a letter dated April 19, 2019 informing her of his decision.  Gutierrez Decl. Ex. G.  Most of the letter discusses the December 2015 fight and related disturbance on the airplane, and Haralabopoulos presents Williams's conduct and that of her family members as the reason for his decision, although he also notes that Williams "provided medical information to [United] which appears to be false," and states that "[t]his would provide a separate and independent justification for your discharge."  *Id.*  In a subsequent email to Williams's union representative, Haralabopoulos stated that although he disregarded as untimely the letters from Williams's husband and doctor, "a fair and reasonable consideration of these documents does not change [his] decision to terminate her employment," because "nothing in these documents changes the fact that Ms. Williams's conduct, and that of her family members, was grossly inappropriate."  Haralabopoulos Decl. Ex. 16.

Williams's union declined to appeal the decision to the System Board of Adjustment. Khoury Decl. Ex. F.

**B.    Williams's Complaint**

Williams's complaint asserts the following claims: (1) discrimination based on disability or medical condition, in violation of California's Fair Employment and Housing Act ("FEHA"), 1st Am. Compl. (dkt. 26) ¶¶ 24–32; (2) discrimination based on age, in violation of FEHA, *id.* ¶¶ 33–38; (3) failure to engage in the interactive process to determine whether a disability can be accommodated as required by FEHA, *id.* ¶¶ 39–45; (4) failure to accommodate a disability as required by FEHA, *id.* ¶¶ 46–52; (5) retaliation "for taking leave, for requesting that [United] respect and honor [Williams's] rights and requests for accommodation, as well as the nature of her medical conditions and disability," in violation of FEHA, *id.* ¶¶ 53–59; (6) failure to prevent

United States District Court
Northern District of California

7

discrimination and retaliation as required by FEHA, *id.* ¶¶ 60–65; (7) wrongful termination in violation of public policy, *id.* ¶¶ 66–73; and (8) "medical leave discrimination and retaliation in violation of the California Family Rights Act," *id.* ¶¶ 74–79 (capitalization altered).[6] The complaint as a whole suggests that United's stated reason for terminating her employment based on the December 2015 incident was pretext for terminating her because she had taken medical leave or because she was an older flight attendant earning the maximum salary for that position based on her seniority.

## III. ANALYSIS

### A. Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237

---

[6] Williams's first amended complaint also included a claim for unlawful business practices under California Business and Professions Code § 17200, but Williams has since voluntarily dismissed that claim, and the Court disregards the portions of Williams's opposition brief addressing it. *See* Order on Stipulation (dkt. 42); Opp'n at 24–25.

United States District Court
Northern District of California

F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B. Disability Discrimination

FEHA makes it unlawful to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" on the basis of, among other things, physical disability and medical condition. Cal. Gov't Code § 12940(a). There are two types of disability discrimination under FEHA: "(1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (referred to as disparate treatment discrimination), and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (referred to as disparate impact discrimination)." *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1246 (2008). Williams has not provided the sort of statistical evidence from which disparate impact could be determined. *See Fuqua v. United Parcel Serv., Inc.*, No. 16-cv-01193-JCS, 2017 WL 4516843, at *23 (N.D. Cal. Oct. 10, 2017); *Gardner v. Fed. Express Corp.*, 114 F. Supp. 3d 889, 900 (N.D. Cal. 2015).[7] The Court therefore construes her claim as based on a

---

[7] Williams briefly argues that she "can demonstrate disparate impact by establishing that an employment practice was taken against [her] where in other similarly situation [sic] employees where [sic] treated differently." Opp'n at 15. That is not the test for disparate impact. The Court addresses Williams's similarly-situated-employees argument below in the context of her disparate treatment claim.

theory of disparate treatment.

In the absence of "direct evidence" of discrimination, California courts analyze disparate treatment disability discrimination claims under the three-stage burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 807 (1973). *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354–55; *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). The elements of a prima facie case of disability discrimination in violation of FEHA are: (1) the plaintiff is disabled; (2) the plaintiff can, with or without reasonable accommodation, perform the essential functions of his position; and (3) the defendant subjected the plaintiff to an adverse employment action because of the disability. *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236 (1997). If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions. *Hawn*, 615 F.3d at 1155. If this burden is met, the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the challenged conduct] are mere pretext for unlawful discrimination." *Id.*

Where there is evidence that an employer had more than one reason for taking adverse action—including both legitimate and discriminatory reasons—a plaintiff must show that discrimination was a "substantial factor" in an adverse employment action. *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 211, 215 (2013). If the employee makes such a showing, but the employer shows by a preponderance of the evidence that it would have made the same decision for legitimate reasons even absent the discriminatory motive, the employer cannot be liable for monetary damages, although the employee may still be able to obtain declaratory or injunctive relief, as well as attorneys' fees and costs. *Id.* at 203.

Assuming for the sake of argument that Williams has presented evidence sufficient to meet the first two elements of a prima facie case of discrimination,[8] United is nevertheless entitled to

---

[8] The Court does not reach United's arguments as to whether Williams can establish these elements. Although Williams fails to address this issue and there is no dispute that Williams could

10

summary judgment because Williams has not presented evidence that she was terminated "because of [her] disability," *Brundage*, 57 Cal. App. 4th at 236, and because United has articulated a legitimate reason for terminating her employment, *see Hawn*, 615 F.3d at 1155. Williams faults United for not conducting a more thorough investigation of the altercation on the aircraft, but as Haralabopoulos noted in his decision letter, a subsequent email to Williams's union representative, and his declaration here, his decision was based on the admissions of Williams and her husband in their December 2015 apology letters, and on United's policy that employees are responsible for the conduct of their guests traveling with them on discounted passes, such that he did not consider it relevant whether Williams or her husband was the aggressor.[9] Williams acknowledged at her deposition that, under United's rules, she was responsible for her family members' conduct, that she and her family members violated various rules, and that violations of the travel pass rules could result in termination. *See, e.g.*, Khoury Decl. Ex. E (Williams Dep.) at 264:4–16.

If other employees accused of similar misconduct experienced less severe punishment, that could perhaps support an inference that something other than the December 2015 incident contributed to the decision to terminate Williams's employment, and that Haralabopoulos's stated reason for doing so was pretext. Williams cites union chapter president Christine Black's deposition testimony that an employee who abused travel privileges by allowing their domestic partner to travel under their name was not terminated. Opp'n (dkt.73) at 15; Gutierrez Decl. Ex. X (Black Dep.) at 71:17–72:9. Williams mischaracterizes Black's testimony, asserting that the employee "received the lowest level of discipline," Opp'n at 15, when Black in fact testified that

---

not actually work as a flight attendant at any relevant time (i.e., from the time of the December 2015 incident through the termination of her employment), it is not obvious that an employee unable to work for a period of time is necessarily unable to fulfill the "essential functions" of a position that, pursuant to an applicable collective bargaining agreement, allows for extended periods of medical leave. The Court also declines to reach United's arguments that Williams cannot proceed on certain of her claims because her leave of absence was governed by her collective bargaining agreement rather than the protections of California law. Williams has not meaningfully addressed those arguments, and there is sufficient reason to grant United's motion on other grounds.

[9] In the context of a disability discrimination claim, it is not this Court's role to determine whether a policy holding Williams responsible for her husband's conduct while traveling is fair or advisable. Even if it were not, the enforcement of such a policy would not constitute disability discrimination in violation of California law.

1   the employee received the highest level of discipline short of termination, Gutierrez Decl. Ex. X

2   (Black Dep.) at 72:5–9.[10]  Black also testified that she was aware of employees who were not

3   terminated for using drugs and alcohol.  *Id.* at 73:5–24.  Neither of those examples of misconduct

4   involved a public disturbance or a flight delay.  Haralabopoulos states in his declaration that in his

5   sixteen years of managing flight attendants he "never heard of any Flight Attendant engaging in

6   conduct comparable to that of Ms. Williams and her family members on December 3, 2015," but

7   the most similar scenario of which he is aware was an off-duty flight attendant who physically

8   pushed past a gate agent and set off an alarm after being told that a flight was closed and she could

9   not board, and Haralabopoulos made the decision to terminate that flight attendant's employment.

10  Haralabopoulos Decl. ¶ 37.  Haralabopoulos's example of a comparable scenario is more similar

11  to the facts here than the examples offered by Williams, in that it involved physical force and a

12  violation of safety and security rules that would have been conspicuous to other travelers and

13  caused a public disturbance.  The treatment of these other flight attendants therefore does not

14  support an inference that Williams's termination was based on her disability.

15      Williams also cites case law holding that the timing of an adverse employment action in

16  relation to protected activity[11] can constitute circumstantial evidence of pretext.  Opp'n at 10

17  (citing, *e.g.*, *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000) ("The retaliatory

18  motive is 'proved by showing that plaintiff engaged in protected activities, that his employer was

19  aware of the protected activities, and that the adverse action followed within a relatively short time

20  thereafter.'" (citation omitted))).  Although Williams had been on medical leave continuously

21  since 2013—and sporadically before then—and United had been aware of her disability

22  throughout that time period, United did not commence the disciplinary proceedings that led to

23  termination of her employment until immediately after the altercation on December 3, 2015.  The

---

[10] "I believe they were issued a level 4. . . . [S]o a level 1 is the lowest level discipline, then goes higher, 2, 3.  4 would be right before you would get terminated."  Gutierrez Decl. Ex. X (Black Dep.) at 72:5–9.

[11] These cases address retaliation theories, where the concept of "protected activity" fits better than in the context of disability discrimination, but Williams addresses them in her argument regarding discrimination based on disability.  Regardless, the timing of Williams's termination does not support an inference that it was based on anything except her and her family's conduct on the flight to Cancun.

1    timing of that action does not create an inference that it was based on Williams's disability.

2          Williams also cites United's investigation of whether she truthfully represented her

3    medical restrictions.  FEHA's prohibition of discrimination based on disability does not bar an

4    employer from investigating whether an employee misrepresented such restrictions, or from taking

5    disciplinary action if it determines that such misrepresentation occurred.  There is evidence that

6    Williams's vacation travel was inconsistent with at least one of her restrictions: "No exposure to

7    varying climate conditions and air pressures."  *See* Williams Decl. ¶ 17; Gutierrez Decl. Ex. N.

8    While Williams's doctor stated in a March 2016 letter—after the incident, but before Williams's

9    termination—that the restriction would not bar her from vacation travel because she was "[n]ot

10   exposed on a daily basis as a passenger," Gutierrez Decl. Ex. N, all evidence in the record

11   indicates that the restriction, as originally presented to and accepted by United, barred *any*

12   exposure to changing pressure or climate, which would necessarily implicate travel by airplane

13   from San Francisco to Cancun.  Accordingly, there is no basis on this record for a finder of fact to

14   conclude that United lacked legitimate reasons to investigate whether Williams misrepresented her

15   restrictions.  Nor does Williams cite any evidence tending to contradict Haralabopoulos's

16   declaration (and contemporaneous writings) that he based his decision on the December 2015

17   incident, not on Williams's medical documentation.  *See, e.g.*, Haralabopoulos Decl. ¶ 33.[12]

18         There remains Elizabeth Cavanagh's email to Carlos Rivera stating that "we are

19   terminating" Williams, sent months before the hearing where Haralabopoulos formally reached

20   that decision.  Gutierrez Decl. Ex. P.  Williams offers no other evidence suggesting that a decision

21   had in fact been made before the hearing—as opposed to Cavanagh merely assuming that the

22   disciplinary process would lead to termination based on the severity of the violations—or

23   contradicting Haralabopoulos's testimony that the decision was his to make, that he made it at the

24   hearing, and that he was not aware of Cavanagh's email.  Haralabopoulos Decl. ¶ 39.  Even if the

25

26   _____

27   [12] At the hearing, Williams's attorney argued that references to Williams's medical leave in United
     employees' discussions of disciplinary proceedings and potential termination supports an
     inference that her employment was terminated based on disability, but conceded that such
28   references would be expected in the context of firing any employee who happened to be on
     medical leave, regardless of whether the decision was made for legitimate reasons.

1    email alone could support such an inference, it does not indicate that Williams's employment was

2    terminated based on her disability rather than on Williams and her family's conduct on the flight

3    to Cancun or on United's belief that she misrepresented her medical restrictions.

4        "[T]he record taken as a whole could not lead a rational trier of fact to find" that

5    Haralabopoulos's stated reason for terminating Williams's employment—the December 2015

6    altercation, which included violations of multiple rules for United employees and led to a flight

7    delay—was mere pretext for discrimination based on disability, or that such discrimination was a

8    substantial factor in the decision. *See Matsushita*, 475 U.S. at 587; *Harris*, 56 Cal. 4th at 211.

9    United's motion for summary judgment on this claim is GRANTED.

10        **C.    Age Discrimination**

11        FEHA prohibits discrimination based on age for employees over the age of forty. The

12   *McDonnell Douglas* burden-shifting framework discussed above applies to such claims. *See, e.g.*,

13   *Hauprich v. Fireman's Fund Ins. Co.*, No. 13-cv-01609-JCS, 2014 WL 3366736, at *19 (N.D.

14   Cal. June 26, 2014) (discussing California and Ninth Circuit authority). The only evidence that

15   Williams cites for the proposition that she was terminated because of her age is a news article

16   describing the outcome of an age discrimination case brought by different flight attendants in

17   Colorado, which Williams asserts is subject to judicial notice as a matter of public record. Opp'n

18   at 16; Pl.'s Request for Judicial Notice (dkt. 74). Assuming for the sake of argument that news

19   media reports can constitute "public records" for the purpose of judicial notice, a court may take

20   judicial notice of public records "not to credit the truth of the allegations or facts set forth therein,"

21   but only for the existence of such documents. *Acasio v. San Mateo County*, No. 14-cv-04689-JSC,

22   2015 WL 5568345, at *1 n.1 (N.D. Cal. Sept. 22, 2015); *see also Lee v. City of Los Angeles*, 250

23   F.3d 668, 689 (9th Cir. 2001) (holding that although the district court could take judicial notice of

24   "the fact that [a document] was signed," it erred in taking "judicial notice of disputed facts stated

25   in public records"). The request for judicial notice is DENIED. Regardless, even if the Court

26   could take notice that United discriminated against two older flight attendants in Denver—which it

27   cannot—that would not show that United discriminated against Williams.

28        There is no evidence that any United employee involved with the decision to terminate

1    Williams's employment took any note of Williams's age—or, to the extent it could be a proxy for

2    age, Williams's seniority and commensurate salary[13]—much less that the decision was made on

3    that basis.  Nor, as discussed above in the context of disability discrimination, is there evidence to

4    rebut United's showing that Haralabopoulos made the decision to fire Williams for

5    nondiscriminatory reasons.  United's motion is GRANTED as to this claim.

6         **D.    Retaliation Under FEHA and the CFRA**

7         Williams asserts that United terminated her in retaliation for her use of medical leave, as

8    protected by FEHA and the CFRA.  "To assert a prima facie retaliation claim under FEHA, 'the

9    plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse

10   employment action, and there is a causal link between the protected activity and the employer's

11   action.'"  *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 868 (9th Cir. 1996)

12   (quoting *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992)).  As with the

13   discrimination claims discussed above, once a prima facie case has been established, the burden

14   shifts to the employer to present legitimate reasons for the adverse employment action.  *Brooks v.*

15   *City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  If the employer does so, the burden shifts

16   back to plaintiff to demonstrate a genuine issue of material fact as to whether the reason advanced

17   by the employer was a pretext.  *Id.* (citing *Flait*, 3 Cal. App. 4th at 476).  The requirements for a

18   claim of retaliation under the CFRA are substantially similar, with the added elements that the

19   defendant must be an employer covered by the statue, and the plaintiff must have been eligible to

20   take leave under the CFRA, have exercised her right to do so, and have suffered adverse

21   employment action on that basis.  *Bareno v. San Diego Cmty. Coll. Dist.*, 7 Cal. App. 5th 546, 560

22   (2017).

23        As discussed above in the context of disability discrimination, Williams has not presented

24   evidence from which a rational finder of fact could determine that her termination was based on

25   wrongful motivations rather than the reason stated by Haralabopoulos: Williams and her family's

26

27   [13] Williams quotes (without citation) a statement of legislative intent "that the use of salary as the
     basis for differentiating between employees when terminating employment may be found to
28   constitute age discrimination if use of that criterion adversely impacts older workers as a group."
     Opp'n at 15.

conduct on the December 2015 flight to Cancun. United's motion is GRANTED as to Williams's CFRA claim and her FEHA retaliation claim. The Court does not reach United's argument, not addressed by Williams, that extended medical leave taken pursuant to a collective bargaining agreement is not protected activity for the purposes of these statutes.

### E. Wrongful Termination in Violation of Public Policy

Williams argues that this claim should proceed because United "violated [her] right when they [sic] terminated her because she was exercising her right to medical leave." Opp'n at 23. As discussed above, no reasonable jury could find on this record that Williams has met her burden to show that United terminated her because she was on medical leave, rather than for Haralabopoulos's stated reason that Williams and her family members violated numerous United policies and caused a flight delay. *See, e.g.*, *City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1161 (1998) (holding that a common law wrongful termination claim based on discrimination "must be 'carefully tethered to fundamental policies that are delineated' in the FEHA on which it is based" (citation omitted)). United's motion for judgment on this claim is GRANTED.

### F. Failure to Prevent Discrimination

FEHA makes it unlawful "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment . . . from occurring." Cal. Gov't Code § 12940(k). A plaintiff seeking to recover on a failure-to-prevent-discrimination claim under FEHA must show that: (1) the plaintiff was subjected to discrimination; (2) the defendant failed to take all reasonable steps to prevent discrimination; and (3) that failure caused the plaintiff to suffer injury, damage, loss or harm. *Leland v. City & County of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008). Because Williams has not shown that she was subjected to discrimination, United's motion is GRANTED as to this claim.

### G. Failure to Engage in the Interactive Process

Under FEHA, an employer's failure "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations" is a violation of the statute separate from any failure to make reasonable accommodations for a qualified employee's disability. Cal. Gov't Code § 12940(n); *Wilson v. County of Orange*, 169 Cal. App. 4th 1185,

1993 (2009). FEHA imposes on employers a mandatory obligation to engage in the interactive process once an employee requests an accommodation for a disability, or when the employer itself recognizes the need for one. *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001). Once initiated, the employer has a continuous obligation to engage in the interactive process in good faith. *Swanson v. Morongo Unified Sch. Dist.*, 232 Cal. App. 4th 954, 971 (2014). The interactive process "requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identifying an accommodation that allows the employee to perform the job effectively." *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 919 (E.D. Cal. 2013). "Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party," and "responsibility for [a] breakdown [in communications] lies with the party who fails to participate in good faith." *Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 62 n.22 (2006). To prevail on a section 12940(n) claim, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred. *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 379 (2015).[14]

Williams testified at her deposition that she was aware of options at United for initiating an interactive process, but declined to take advantage of them:

> Q. Okay. Maybe my questions are not being clear. When did you attempt to engage with United in an interactive process about your disability?
>
> A. I didn't.
>
> Q. Did you ever ask United to engage in any kind of interactive process with you regarding your disability?

---

[14] The parties have not addressed this issue, and the Court recognizes that there is some disagreement among the California appellate courts as to whether a plaintiff bringing an interactive process claim under § 12940(n) must show that a reasonable accommodation was in fact available. *See, e.g.*, *Claudio v. Regents of Univ. of Cal.*, 134 Cal. App. 4th 224, 246 (2005) ("Because we shall conclude a triable issue exists as to whether the University failed to participate in the interactive process, it cannot be known whether an alternate job would have been found."). The Court nevertheless concludes that the requirement for such a showing, as stated in *Nealy*, represents the more common view and more likely reflects how the California Supreme Court would address the issue.

United States District Court
Northern District of California

1    A. I was advised by the union not to --

2    MR. WATTS [Williams's attorney]: That's a yes-or-no question.

3    THE WITNESS: No.

4    Q. [by defense counsel] Now you said you were advised -- what were
     you advised by the union?
5

6    A. I was advised by the union that the reasonable accommodation
     process is basically like a trap. It's not an actual process that would
7    allow a disabled person to help themselves.

8    Q. All right. I understand that's what the union old you. Did you ever
     have any conversations with anyone at United about a request by you
9    to engage in any kind of interactive process?

10   A. No.

11   [. . .]

12   Q. Well, you understood that you could contact the employee service
     center or your supervisor if you wanted to discuss the reasonable
13   accommodation process; right?

14   A. I wouldn't trust them to contact them, no.

15   Q. No. I'm asking you. You understood that you could contact the
     employee service center or your supervisor if you wanted to discuss
16   the reasonable accommodation process; right?

17   A. Could I? Yes. Would I? No.

18   Q. Okay. So I take it that even though you understood that you could
     contact the employee service center or your supervisor to discuss the
19   reasonable accommodation process, you chose not to make any
     attempt to do so; true?

20   A. Yes.

21   Khoury Decl. Ex. A (Williams Dep.) at 305:3–307:5.  There is no evidence that United's process

22   for discussing accommodation of disabilities was in fact ineffective or a "trap."  No reasonable

23   jury could find on this record that blame for the failure to initiate an interactive process, or the

24   breakdown of any such process, lies with United.

25        Although not addressed by the parties with respect to this claim, United is also entitled to

26   judgment because Williams has not identified any reasonable accommodation that United failed to

27   provide.  *See Nealy*, 234 Cal. App. 4th at 379.

28        Williams argues that United was wrong to require frequent reports from her treating

18

physician in order to justify her continued medical leave. Opp'n at 17–18. She cites no authority that such a requirement—which arguably shows that United required William to participate in an overly thorough interactive process—can support a claim for failure to engage in the interactive process, and the Court declines to so hold. United's motion for summary judgment on this claim is GRANTED.

### H.    Failure to Accommodate

FEHA makes it unlawful "for an employer . . . to fail to make reasonable accommodation for the known physical . . . disability of an applicant or employee." Cal. Gov't Code § 12940(m). The elements of a prima facie claim for failure to make reasonable accommodation claim are: (1) the plaintiff has a disability covered by FEHA; (2) the plaintiff is qualified to perform the essential functions of the position; and (3) the employer failed to reasonably accommodate the plaintiff's disability. *Scotch v. Art Inst. of Cal.*, 173 Cal. App. 4th 986, 1010 (2009). "Reasonable accommodation" means a "modification or adjustment to the workplace that enables a disabled employee to perform the essential functions of the job held or desired." *Taylor v. Trees, Inc.*, 58 F. Supp. 3d 1092, 1111 (E.D. Cal. 2014); *see also* Cal. Gov't Code § 12926(p). The reasonableness of an accommodation is generally a question of fact, *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 228 n.11 (1999), but "FEHA does not obligate an employer to choose the best accommodation or the specific accommodation a disabled employee or applicant seeks," *Raine v. City of Burbank*, 135 Cal. App. 4th 1215, 1222 (2006). A claim under section 12940(m) differs from a section 12940(a) discrimination claim in that a plaintiff need not prove any adverse employment action, nor is any showing of a causal nexus between one's disability and an adverse employment action required. *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 255−56 (2000).

In response to United's motion to dismiss this claim, Williams argues that United's requirement that she provide "monthly or even more frequent" reports from her doctor was unjustified, and that her physician's office found United difficult to communicate with. Opp'n at 19–20. Williams cites no authority that such procedural hurdles can support a failure-to-accommodate claim, much less where an employer in fact provided the accommodation sought by

the employee—here, a paid leave of absence.[15]  Williams acknowledges in her opposition brief that "[b]eing on leave because of a disability sustained at work was a reasonable accommodation." Opp'n at 11.  Even if Williams had identified a different accommodation that she would have preferred, which she does not, United was not obligated "to choose the best accommodation or the specific accommodation a disabled employee . . . seeks."  *Raine*, 135 Cal. App. 4th at 1222.

Williams cites *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935 (1997), for the rule that an employer in at least some circumstances must consider whether alternative jobs are available for disabled employee, even if the employee has been placed on leave and has not requested such an alternative accommodation.  Opp'n at 19.  In that case, a pilot had been involuntarily placed on medical leave after he no longer met FAA medical standards as a result of an AIDS diagnosis.  There is no indication that the plaintiff in *Prilliman* conceded that his medical leave was a reasonable accommodation, as Williams does here.  *See* Opp'n at 11.  Moreover, the *Prilliman* court identified as the "primary flaw in respondents' motion for summary judgment . . . that it fails to address the issue of what policies or resources United made or makes available for its employees," 53 Cal. App. 4th at 953, while Williams conceded here that she understood she could have "contact[ed] the employee service center or [her] supervisor to discuss the reasonable accommodation process," but declined to do so based on the advice of her union, with no evidence offered in the record that such processes were in fact ineffective or futile, Khoury Decl. Ex. E (Williams Dep.) at 305:4–307:5.  Williams also does not suggest that she would have preferred an alternative position to medical leave, and there is no evidence that Williams would have been able to perform any other job at United with her restrictions, which included a need for assistance with dressing and grooming, inability to commute to work independently, inability "to communicate well 50% of the time," "0-30% minimum maximum standing in aisles and galleys," inability to manage others or resolve disputes, and inability to work variable hours, among other restrictions. *See* Williams Decl. ¶ 17.

---

[15] To the extent that Williams's claim is based on the premise that United ceased accommodating her when it terminated her employment, the Court holds that Williams has not prevented evidence to support a conclusion that her termination was improper, as discussed above.

Because there is no dispute that United provided Williams a reasonable accommodation until her termination, United's motion is GRANTED as to this claim.

## IV. CONCLUSION

For the reasons discussed above, United's motion is GRANTED as to all of Williams's claims. The Court does not reach United's remaining arguments, including those based on exhaustion of administrative remedies. The Clerk is instructed to enter judgment in favor of United and close the file.

**IT IS SO ORDERED.**

Dated: June 25, 2019

JOSEPH C. SPERO
Chief Magistrate Judge